Case number 23-8233. Stephen Thaler, an individual, appellant, versus Shira Perlmutter, in her official capacity as Registrar of Copyrights and Director of the United States Copyright Office and U.S. Copyright Office. Mr. Abbott, pretty appellant. Mr. Crown, pretty appellant. Good morning. May it please the Court, my name is Ryan Abbott, counsel for appellant Stephen Thaler. This is a case of first impression, whether an original work generated by an AI system in the absence of a traditional human author is copyrighted. In this case, the work satisfies all the statutory requirements under the Copyright Act to receive protection, but the Copyright Office has denied registration by reading a requirement into the Act that does not exist. Nowhere in the Copyright Act does it say that a work requires a human author, much less a traditional human author, as the Office is now requiring. The Copyright Act does not define the term author, and it expressly permits non-human authorship by allowing corporations, governments, and other non-human entities to be authors. I don't understand why you're saying this does not involve a traditional human author. The administrative record document says that there was no human involvement, this was completely autonomous. Your theory for authorship wasn't that Dr. Thaler was an author and the machine assisted him in authoring some sort of work-for-hire or some other sort of theory, it was that the machine itself was completely the author. So it's not that this is a non-traditional human author, there's nothing human at all about this under your theory of copyright ownership. Well, Your Honor, I respectfully would disagree with several aspects of that, and that that does not accurately reflect the administrative record, although that is what the Copyright Office is saying. The record shows that, you know, the Copyright Office's test is, they will grant copyright if a human rather than an AI meets the traditional elements of authorship, and the submission noted that the AI autonomously made the image. That isn't to say that Dr. Thaler wasn't involved in it. The registration also said that Dr. Thaler made and used the AI to make the image. Now, this fit into the Copyright Office's test, which is not in the Copyright Act, which is... Hang on, so your application is author, creativity machine, author created, 2D artwork created autonomously by machine. And only thing with Steven Thaler is ownership of machine. Well, that was in the registration form, and then there were a series of submissions in the request for reconsideration that expanded and elaborated on the role of this. And those submissions explained... Did you change that then? Was that no longer accurate? Well, Your Honor, that is accurate. Okay, then it's autonomously made by the machine, and Steven Thaler's only connection is he owns a machine. Well, no, Your Honor, that is not the full record. That was the one-page registration form. The submission explains, which is in the record, that the machine did the thing one traditionally associates with authorship, making directly the image. It also explained that Dr. Thaler built and used the machine to make the image. It's not claiming that he did... But the machine acted autonomously. Have you changed... It says on the form that the machine autonomously created the image. Right, and I think, Your Honor, this may be having to do with how autonomously is used in computer science. It is automating the traditional act of authorship. So, for example, if I ask my phone, generate a creative image, and it does, the phone is automating the traditional elements of authorship. Nevertheless, there is a human originator who programs the phone to do that, who instructs the phone to do something. It is both true that the machine autonomously traditionally conceived of the elements of authorship and that Dr. Thaler originated it by building and using a machine to make the image. Then why not just have Dr. Thaler say he's the author? Well, that is one of our alternate arguments, that Dr. Thaler is the author. But the Copyright Office... But you didn't put that on the registration form, and that's not the issue before us. Because the issue before us is that the Copyright Office didn't approve your desired registration the way that your client articulated it on the form. Well, respectfully, Your Honor, we disagree with that. That was in the submissions in the request for reconsideration, that the copyright could also go directly to Dr. Thaler as the user, programmer, and owner of the machine that made the image. That is in the record. The district court did not acknowledge that. The Copyright Office has not acknowledged that. But that is in the submissions, the Copyright Office, in the request for reconsideration. The case before us in your brief is a creative work generated by an artificial intelligence system in the absence of direct contribution by a traditional human author, copyrightable. Is that accurate? Yes. Okay. And so it's created in the absence of any direct contribution. Well, I think... Direct is someone had to build the machine. Someone had to turn the machine on. So one of the questions that poses... Is that accurate? What do you mean by direct contribution? Well, precisely, right? What does it mean to author or originate a work? The Copyright Office's compendium says that if the traditional elements of authorship are done by an AI, you can't get a copyright. And that is the position of our case. The AI did do that. Okay. But authorship and originality mean that a work created and stemmed from someone and came as a result of someone's efforts. That is also true. That if not for Dr. Thaler building a machine and using a machine to make an image, the work wouldn't exist. And so as the Copyright Office thinks of an author, he is not an author. As I would urge this court to consider an author, he is an author because all it means is Dr. Thaler caused the work to come about. But we did want to be candid that this was not done in the way that one paints a picture. He instructed a machine to do something that it then did. If I tell my printer, I turn it on, I purchase it. Let's say actually I'm a really... This is totally made up. If I actually knew something, I built my own printer. I turn it on. I pick something up, tell it to print. It's printing. And then all of a sudden, it jams up. And instead of just reproducing information, out comes a smeary image created entirely by the machine because it jammed up. Is that... Have I made an indirect contribution to the creation of that smeary image work? Yes, Your Honor. And I would say that if... You say that I could get a copyright in that miscue by the jammed machine? I would say if the work is original, then yes. It's original? Yes. Yes, we'll say it's original. Okay. Then I would say yes. It gets a schmear like I do. If you caused an original work to come about and you are the only human author, then yes, you would be the author. Turning machines on and asking them to do something that is actually not copyrightable. Correct. Copy stuff. Well, and I think, Your Honor, when one... And out it comes. I have created. That's your argument here? Yes, Your Honor. Okay. Well, Your Honor, I think... That's the argument you presented. In the creative process, one does things all the time that don't necessarily result in an intended outcome, and these remain original works. An originator literally means the work came as a result of someone's effort. Someone had possession over the work. And if this court is looking for a human author... Right. Result of efforts and possession are different things. Well, indeed they are, but in both cases, Dr. Thaler, on the record, would be the author of this. And both are consistent with the definition of authorship. But my theory was this was a work for hire. Well, that is an alternate theory that we're arguing. That under the work for... No, that's not... Again, on your... Did you... Where on the record did you say you're not just arguing for hire, which is what your application says? Where did you... These were in the request for reconsideration, where it noted that the AI was the proximate author of the work, and that it should go to Dr. Thaler either by operation of law or under the work for hire doctrine, or that he... What operation of law would there be other than a work for hire? By possession or accession. Is it your common law property theory? And it is a theory that applies to ownership of tangible and intangible property in a wide variety of contexts. Ownership is not creation. What is your best case that ownership is what counts as authorship under the Copyright Act? Oh, I'm not suggesting that ownership is what counts as authorship. You just did. You just said because he owns it under common law, he possesses it, and so he's creator... He's the author of it. No, Your Honor. He possesses the work. Possession is a basis for ownership. Yes. Sorry, I got a little mixed up there. I mean, one theory of unowned property is if the AI made an image that's original and unowned property by first possession. That's not authorship. Unless you're calling it work for hire. Well, which is why we argue that also... I am getting profoundly confused by what your theory is here. Our theory is that... Work for hire, and that can, as a matter of law, make something created by one, like an employee, automatically the employer becomes the author or is deemed the author for a purpose as a matter of law. I asked you for another... Whatever... You said operation of law apart from work for hire would make him... I thought you said it would make him the author. I don't care about owning. I care about... No, no, no. That would make him the owner, not the author. I'm sorry. Well, we only care about authors. Right. And so there are three options for how authorship could work if the court finds this is a protectable original work, which we believe it is. First, that the AI is the author because it was factually the proximate creator of the work, and that Dr. Thaler owns it by operation of law. Second, that Dr. Thaler is deemed the owner under the work for hire doctrine. Or third, that Dr. Thaler is directly the author because he is the originator of the work, even though he didn't make a direct traditional sort of contribution to the work. That's just another way of your first argument. Your third is just rephrasing your first one. Well, the third... I don't have to make any contribution to it. It can be autonomously created by the computer as long as there's a human that turns a machine on, maybe builds a machine. Well, well, exactly. I mean, but that is a contribution. You should be stating up your first argument, and that only works if the matter created by the image, the work, is still, under your third theory, the work is still autonomously created by the computer. That hasn't changed. That hasn't. All you're doing is adding, you're reminding us that he built and owns the machine, and maybe turned it on that morning. Well, Your Honor, under the third theory, he directly qualifies as an author by virtue of what he did, which was indirect, which was building and using a machine. Under the first theory, he is merely acquiring... Building's got nothing to do with it. Well... I mean, sorry. Kodak builds cameras, and so therefore they can be the authors of pictures that someone takes with a Kodak camera. Well, in fairness, much like Burrough Giles, you know, people are the authors of pictures that their cameras take. No, the people who take the photo. Come on, the analysis there was all about the artistry in setting up the photo, the angles, the lighting, the image you choose to do, how you choose to do it, how you frame the person. That's not done by Kodak. That's not done by Kodak, but that is increasingly done in an autonomous fashion, you know, compared to Napoleon Sironi. All right. I'll leave the remainder of my time for rebuttal if that's all right. All right. Do you have any other questions? Do you have any questions, Judge Rogers? No, thanks. All right. Thank you. Can you start by telling us what the question is in this case, according to the administrative record?  Good morning. Nicholas Crown for the government. The question in this case is narrow to whether under APA review, the Copyright Office correctly denied a registration application that claimed on its face that the work was autonomously generated by an AI and identified as the author, not a human being, but the AI. Judge Wilkins, you asked some questions about what was in the administrative record. I think you're exactly right. There are a couple other citations I'd like to give the court, maybe working backwards, in the district court. In fact, at the summary judgment stage, Dr. Thaler asserted it was an undisputed material fact that, quote, there was no issue of human involvement in this case. That was the basis on which the agency rendered its decision. It made that clear in footnote three on second reconsideration that it understood that there were no questions of human involvement. Dr. Thaler was not claiming that he was the author of this work. Instead, his theory, this was a test case, he was asserting that an autonomously created image that was generated by a non-human AI was the author. As we pointed out in our papers, as the agency pointed out on first and second reconsideration, and as the district court pointed out, the statutory text and structure make clear that authors are human beings. As for the other theories that Dr. Thaler has presented here, for example, the work made for hire doctrine, that just doesn't work. The Supreme Court made clear in the Reid decision there are two mutual exclusive ways in which you could have a work made for hire. Dr. Thaler doesn't make any arguments that this was a specially commissioned work because he concedes his AI can't enter the contracts or the arrangements necessary there. And again, he conceded that his AI is not his legal employee. Can I just ask a procedural question? Of course. If the registration form says one thing and then the copyright office denies the registration and the applicant moves for reconsideration and they have a different theory, like they started saying, well, I'm the author for whatever reason that gets denied, and then they say, okay, under the work for hire doctrine, I should be registered as the author. Do they have to file a new registration form, or does the fact that they assert that in their motion for reconsideration kind of essentially amend their registration? I think it depends on the circumstances. If it's an example here where the theory is diametrically opposed to what was on the face of the application and was the basis of the decision in the first place, I think it would be a tough argument to say all you're doing is supplementing or amending the registration. I think Dr. Thaler, in some circumstances, could generate a new image. He could file a new application, raise the same theories that he seems to be raising in federal court, but he did not raise before the agency in the first instance. What does that mean to amend? As we pointed out in our brief, there are circumstances when there can be correspondence between the registration specialist and the applicant if it looks like on the face of the application there's been a mistake or something is not particularly clear. In the AI context, as the agency made clear in its guidance document in March of 2023, there are circumstances when the agency will register works that contain AI-generated material, but that might require the applicant to disclaim certain parts of the work that was generated exclusively by the AI. In those circumstances, you could have an amendment to the application where the new statement is disclaiming some parts of the work, while other parts can be entitled to copyright protection, or at least entitled to a registration, which is prima facie evidence that you have a valid copyright. One of your arguments in your brief was about the inability of machines to hold the property rights that come with the copyright and license them to pass things on to heirs. How do you reconcile that with the Supreme Court's decision in Belford v. Scribner in the 1800s that recognized the copyright in a woman, even though a woman could not have any personal property rights? I think there, what we're talking about is the 1976 Act, and what the question is here is whether authorship requires a human being. So it didn't require someone who could have property rights in the 1800s, but it does now? Well, no, I guess I'm coming at it from a different angle. So for purposes of the 1976 Act, the way we know that an artificial intelligence or a machine, for example, my car, my navigation system, Siri, if I ask for weather updates, the way we know that is not going to be the author of a creative work is, among other things, because it can't actually have any of the rights that accrue to a human being as recognized in the 1976 Act. A young child creates something. They can't have property. They aren't of the age to consent to anything or to exercise property rights. It all has to be done by someone else. I want to be clear what we're talking about here, because I think there is a distinction between having property rights and being an author. So for purposes of authorship, what the Copyright Act requires is there has to be some level of originality, which the Supreme Court has explained involves a level of creativity. I think a human child could exhibit, but for purposes of the Copyright Act. A machine could create something that's original and has some element of creativity. That's why I thought part of your argument was looking at the structure of the statute has all these references to handling of property and treating the Copyright Act or the copyright that you obtain as a property interest and passing it on or licensing people to use the material, which you couldn't do. And so I'm asking, how does that apply then if you have a young child or someone who, for whatever reason, is under guardianship and can't exercise property rights? Even in the guardianship example, we're still talking about human beings. And as you pointed out, the Copyright Act does allow… A human being or something that can hold property rights. I'm sorry. I thought your argument about property rights, do you have to be able… I had read your brief, and if I'm wrong, correct me, to point to some of the textual indicia that you pointed to to say the statute envisions only humans holding copyrights. And part of that was humans can have property rights and machines cannot. Did I misread your brief? No, and I want to be clear here. I think what we're talking about is authorship, which is distinct from ownership, of course. But in terms of the structure of the Copyright Act, I think you're right. What we're talking about here are all these things that indicate humanity as opposed to an inanimate object or a machine. So, for example, children can have under the Copyright Act, for example, they can have the rights to terminate a license passed on to them. So that's something that's reflected in the Copyright Act. But when it refers to an author's widow, an author's widower, children, grandchildren, that's all indicating humanity. In the Scribner case, the Belford v. Scribner, you're pretty clear you can hold a copyright even if you don't have personal property rights. So that was the holding. And I don't think that's particularly informative of the 1976 Act and the dispute here. The narrow question is whether an AI can be the sole author of a copyright. And the answer, we think, based on the 1976 Act's text and structure, the decisions from the Ninth Circuit and the Seventh Circuit discussing human authorship, and the longstanding interpretation that the Supreme Court has had since serenity on down, including the Copyright Office's views from before the 1976 Act and consistent after the 1976 Act, all show that copyright authorship is a human endeavor. And again, that's why copyright duration in the standard case is going to be measured by the life and death of the author. And a machine doesn't have a life or death. So you're using the kind of presence of property rights as a kind of a way, an indicator that Congress intended for human authorship only as opposed to saying that in order to be an author, you have to have been able to exercise property rights. Right. It's one of dozens of indications that we think are present in the Act. Do you know whether enslaved people were ever granted copyright? I don't know the answer to that question. But what I can tell you is in the 1976 Act that Congress enacted, again, that was about 10 years after the Copyright Office made clear its views that there's a distinction for authorship purposes between just the mechanical reproduction of something that a machine does versus human interaction and human ingenuity. 10 years later, Congress steps in and enacts the Copyright Act. Four years later, it adds computer programs to the definition of literary works in Section 101. Again, not disturbing the longstanding definition of authorship. In 1998, it extends copyright duration from 50 years to 20 years from the author's death. So again, all these indications that authorship is always required for the 1976 Act, at the human input in creating the work. Now, what about the argument made by Appellant and also made forcefully by Amici that your proffered interpretation of the Act will stifle innovation and create the wrong sorts of incentives? I think a couple of responses to that. One, as we pointed out in our brief, I think the Amici might be laboring under a misinterpretation that the Copyright Office will never grant registrations in the context of works that involve AI-generated content. But in terms of the policy arguments about what are the right incentives, what's the right balance to strike? Again, as the Supreme Court recognized in the Georgia case, it pointed it out again in the Sony case. Those are really questions for Congress to answer. So the Copyright Clause in the Constitution is a legislative grant of power. And within those limits, Congress gets to set its policy choices in terms of where the proper incentives lie. And I think for purposes of this case, when that question is not presented squarely here, when we have hotly contested issues in terms of AI and what the proper incentives should be for intellectual property, those are really questions for Congress, not for this Court on APA review of an agency decision based on this limited record. Well, I wondered whether or not the President didn't suggest that maybe the question isn't for a lower appellate court, but maybe the Supreme Court would be more responsive to the notion of what the original purpose of copyright was and some of the arguments appellate makes here. But as my colleagues' questions have reemphasized and is in your brief, the question before this court is very narrow because of the way it was formed. So a lot of these intriguing questions really are presented for decision here. And I thought that's the way the district court treated the case as well. That's exactly right. And I think there's wisdom in the district court's approach here when it recognized based on plaintiff's own framing of this case, the case presents a very narrow question. And that's all the district court passed on. And we think that's the only thing that's up for review in this APA posture before this court. So what's your response to appellant's argument that the district court, I can't remember the verb he used, but basically ignored the representations made in the petitions for reconsideration? We respectfully but forcefully disagree with that statement. Again, if I could just point out a couple of spots in the record, starting just with the complaint. This is JA 25, paragraph 18 of the corrected complaint. Plaintiff alleged, quote, plaintiff separately noted in the application that the work was autonomously created by a computer. Paragraph 22, this is JA 25, quote, the USCO, that is the Copyright Office, accepted that the work was autonomously created by artificial intelligence without any creative contribution from a human actor. So I don't see how the district court could have erred when it sees these representations made in the complaint. And you add to that JA 92, paragraph 9 of the motion for summary judgment when, again, plaintiff himself recognized that the only question that the Copyright Office passed on was the one presented in the application, and, quote, there was no issue of human author involvement. He stated that as an undisputed fact, but I don't think it's error for the district court to have taken plaintiff at his word, just as it wasn't error for the agency to take the application on its face. Thank you. Does the Copyright Office, when it receives an application for something that is created by AI, but in which the human has a role in contours of what it wants made, maybe the sources to which it points the machine, and the sort of type of images and colors and judgments about what it should produce, does it look at those the same way some variegals in the camera situation, or does it have a, as Mickey seemed to suggest, a higher, stricter standard if AI is involved? So I think the most recent views are in that 2023 guidance we cited and permalinked in our brief, but in general, yes, the answer is it's a careful inquiry based on the record that's before it, so things... I'm sure it's always a careful inquiry. I think some of the questions that the Copyright Office would ask if it had been presented in this case with an application like the ones that you posited, it would ask things like, well, if Dr. Thaler trained the machine, how did he train his AI? What prompts did he use in creating this work? What were the initial results? What did Dr. Thaler do in response to getting those results? How long did it take? Is this image just a carbon copy of something the machine had already been trained on such that it wouldn't be original at all? Those are the types of nuanced and careful questions and analysis the Copyright Office would engage in if it's getting that type of application involving AI-generated works, but, of course, that didn't happen here because that wasn't the theory or even the representations made in the application here. Didn't have a chance to make those types of determinations because Dr. Thaler presented a very different case. Hey, Thaler AI, give me an image of a dog that's rainbow-colored and a mix of three breeds. I'm trying to come up with something that I'm assuming is going to be original, which is hard in this world of the internet, but along those lines, give me something like that. Would that be sufficient to have the role of human creativity? I'm just trying to understand how it works in this context. I understand the factors you just said, but it sounds to me like it may be more exacting than it would be in a Burrough-Giles situation. Yeah. Candidly, I think the Office does take a careful look. I just don't know. It's hard to say in the abstract what the Office would do based on these circumstances because it will just depend on the particulars of the work and what the human did. But I think in terms of this test case, the whole point is you don't have to draw those lines. This is just an up-down vote on whether you have to have some human involvement in creating the work. We think the answer is yes for all the reasons we pointed out and as the district court explained. The House and Senate each have task force or groups looking into AI. This is extra record, so if you don't know, that's fine. I just didn't know, is the Copyright Office, are they aware of communications with or working with Congress on legislation on this matter? I want to be careful and answer your question accurately. I'm not aware of particular correspondence that has happened. Very recently, what I can tell you is that the Office had a notice of inquiry to the  I think that issued in August of 23. The comment period was extended. The Office received 10,000 responses, and it is working on a report that's going to respond and provide views, including recommendations for Congress on what to do next, based on a whole host of topics. I think the most recent, Volume 1 of the report, dealt with digital replicas. For example, the fake Drake song, that came out, I think, over the summer. There have been bills and things on those, at least already. I'm not aware of any particular correspondence between the two. That's not in this record. Are there any other questions? Judge Rogers, do you have any more questions? No, thank you. We would ask the court to affirm. Thank you. Mr. Abbott, we'll give you two minutes. Thank you, Your Honor. I think that this case has exactly the factual record for the important issues this case is raising, and that they have been misconstrued by the Copyright Office and the District Court. It is not Okay, so just stop right there. When the District Court held that you attempted to transform the issue by asserting new facts about what you were calling indirect control of the machine, and that that hadn't been raised before the court or the agency, are you arguing that that was error by the District Court? Yes, Your Honor. I mean, for example, in appendix In your blue brief, do you raise a challenge to the waiver decision by the District Court? Yes, Your Honor. I mean, we do make the case that Dr. Thaler also directly qualifies No, no, no. So the District Court, you made this argument to the District Court Yes, Your Honor. And the District Court said you waived that. You didn't raise it before the agency. Well, but that was incorrect. Okay. And you get to come here and you get to argue to us that District Courts made errors, but you have to raise them in your brief. So where in your blue brief do you dispute the District Court's waiver decision on that issue? Well, we didn't specifically use the word waiver, but in raising that argument Okay. Where do you dispute the District Court's ruling? Oh, well, in all the sections about where Dr. Thaler directly qualifies as an author Say, making an argument that someone qualifies as an author is not the same thing as saying we adequately preserved this argument before the agency and the District Court erred in concluding otherwise. That's a very different argument. Just making the argument here is a legal argument to us. What I'm asking you for is where have you challenged that aspect of the District Court's decision? Well, apologies, Your Honor. I think that is implied in our brief. So we don't need to imply it. You get to either raise the issue or you don't. But we didn't. In your issues presented, I see it nowhere in your argument about the claim of indirect authorship. I think that's extensively in our brief, Your Honor. In the challenge to the District Court's decision? Correct, Your Honor. Point me to the pages. I'd have to grab my laptop, Your Honor. There's the brief there. I can't remember the pages. Or if you want to do it after arguing, send a letter and tell us where in your blue brief I will. In the challenge to the District Court's decision. I will do. That you waived that argument. And, you know, these facts were presented in answer to your question of the Copyright Office, the request for reconsideration or a back and forth with the office. I mean, the one-page form is very simple. I'm asking you where you challenged the District Court's ruling that you waived this argument. And I will supplement with an answer to that, Your Honor. It has to be in your blue brief. It has to be in the brief. And it can't be implicit. It needs to be in words. And in the record, in the back and forth with the Copyright Office, for example, on Appendix 52, we say Dr. Thaler can also qualify. He is the user and the programmer of the AI. The problem that I have with all of this, and this is why I asked you the very first question that I did, is that all that's well and good. But your complaint doesn't say that the Copyright Office erred by denying our modified theory on reconsideration. Your complaint says that we assert that with no human involvement, we should be able to get a copyright, and the Copyright Office said no, and that's wrong, and that's arbitrary and capricious under the APA. That was your theory. Right. And that does remain our theory. Are you arguing to us about other things that were said on reconsideration that aren't in your complaint? Well, Your Honor, I mean, there were multiple theories on which we argued in the alternate, and the primary one was that even without a direct human contribution to the work, the work remains protectable. And the Copyright Office says that's for Congress as a matter of policy. Our view is that the Copyright Office is making policy here outside of the statute, because nowhere in the Act does it say you have to have a human author or a traditional human author or any of that. And the Supreme Court in Blastein, among others, has cautioned that if there isn't an explicit restriction in the Act, then the work should get registration. You know, I wondered about that argument in terms of the traditional recognition by the interpretations that are outstanding, unless it makes clear that it's changing something. And here we have legislative history where at least the House Committee says that the Copyright Office has made it clear that it's not changing anything. It's not extending anything. It's not withdrawing anything. It's simply a continuation. And we, the Congress, are going to make several changes, like the number of years, that type of thing. So in that circumstance, Congress is deemed to have known about the interpretations by the Copyright Office and didn't give any indication that it disagreed with them. So if that is the legal framework in which we're dealing, then aren't the questions that my colleagues are pursuing with you as to the clarity of your claim, your theory, and of your claims of error by the Copyright Office, as well as the District Court, aren't they crucial for this court to be able to address the arguments you want decided? In other words, there's a whole process here, and you want to jump the process. And you may ultimately persuade. But we're a step away from it because of the way the case has been presented to us. We're two steps away in the sense of the courts deciding, much less the Congress deciding if it's necessary for it to act. Well, Your Honor, I think with regards to whether Congress should act, I think current counsel, what I'm trying to get at is it's critically important for you to alert the court as to what the errors are. Not that, well, we made these general arguments about Dr. Thaler should be the owner, should be the author, et cetera. That's distinct from pointing out where you raise these points, and they were overlooked either in error by the Copyright Office or error by the District Court. I mean, that's what I think all these questions are going to. And my earlier question was trying to say that. I think there are a lot of intriguing arguments you make, but the question is, are they before us? Have they been preserved for us to address them? Right. And our view is they have, Your Honor. And with respect to the bucket of questions about nuance between what an AI does and what a human does, that's why I think the record is perfect for this court, because we are not in that nuance. We agree with the Copyright Office. Our position is all that nuance stuff is done by the AI, right? Dr. Thaler did not give a direct creative contribution to the machine. Under the Copyright Office's policy, even if they had fleshed that out, it would have been rejected. As to congressional silence, I believe, you know, we've cited a case. I can't recall it off the top of my head that Congress's silence is just that silence. There's never been a case on which the Copyright Office has publicized denying an application for an AI-generated invention. So this is the first case. And even if buried in the compendium some time ago, this was a rule somewhere, I don't think we can deem Congress to have known and approved of that. When Congress did commission a body to look at this in the context of computer software and copyright, the commission said technology isn't advanced enough, that we don't have this kind of direct minimal level of human input into this. And now we do. So I don't think Congress has explicitly weighed in on this, but I think that the Copyright Act itself is clear that it's designed to accommodate technological progress, that it's designed to accommodate the benefits of new technologies, and that, as the amicus brief discusses, every application the Copyright Office has gotten, they've disclaimed anything that generative AI has  So while our case is on the far end of the spectrum, that's what makes this an ideal case for a legal decision from this court about whether you need a direct traditional human author to make a work. And if not, then the work is protectable and belongs to Dr. Thaler under one of our theories. What do we do with all the Supreme Court? You talk about silence and stuff from Congress, but the Supreme Court has said that sound policy as well as history supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Accommodating new technology is for Congress. Well, yes. Regulations of these relationships and any ultimate resolution of the many sensitive and important problems in this field must be left to Congress. Well, and as you say, Your Honor, Congress is considering this matter, and they may change the law, whatever this court decides. But current applicants have a right to an interpretation of the current Copyright Act because this is a widespread phenomenon. People are using AI to make images. And they should be protectable under the Copyright Act. There's no restriction against it. And if there's no restriction against it. Rogers, do you have any more questions? No, thank you. All right. Thank you very much. The case is submitted.
judges: Millett; Wilkins; Rogers